**Angela WILLEY, etc., et al.,
Plaintiffs, Appellants,**

v.

**John KETTERER, M.D., et al.,
Defendants, Appellees.**

**No. 88–1163.**

United States Court of Appeals,
First Circuit.

Heard Feb. 7, 1989.

Decided March 14, 1989.

Philip J. Crowe, Jr., with whom Elizabeth N. Mulvey and Lubin & Meyer, P.C., Boston, Mass., were on brief for plaintiffs, appellants.

William L. Chapman with whom Ronald L. Snow and Orr and Reno, Professional Ass'n, Concord, N.H., were on brief for defendants, appellees.

Before BOWNES, ALDRICH and BREYER, Circuit Judges.

BAILEY ALDRICH, Senior Circuit Judge.

This is a diversity action in the District Court for New Hampshire for malpractice brought on behalf of plaintiff Angela Willey, ppa, against John Ketterer, M.D., the delivering obstetrician, and the Mary Hitchcock Memorial Hospital, claiming that the minor plaintiff's cerebral palsy—an impairment of the nervous system's control of muscular activity—should have been anticipated and could have been avoided by a Caesarian section to shorten labor. The jury returned a verdict for defendants. Plaintiff's vehicle for asserting errors occurring during trial rests on her appeal from the denial of her motion for new trial. In the course of its opinion denying the motion the district court, quite properly, overruled defendants' procedural objections, and found that plaintiff's objections at trial were sufficiently preserved to "surmount any procedural bar to their argument." We agree with plaintiff as to the substantial nature of the errors; we find that the court applied the wrong test as to the motion, and we hold that, on its own findings, it should have granted, rather than denied it.

As an introductory matter we reject out of hand, what we sometimes suspected to be suggested during oral argument, that plaintiff failed to make a case for the jury. The court expressly, and correctly, stated that she made a case. What we disagree with is the court's ruling that since it could be found that defendants made out a case, and the verdict was not against the weight of the evidence, defendants' errors did not entitle plaintiff to a new trial even though it found them prejudicial.

The prologue to this case took place in chambers when, prior to trial, plaintiff presented two motions in limine, one of which sought to preclude "reference to or introduction of evidence regarding the medical history of Angela Willey's sister, Danielle." The motion pointed to Danielle's history of seizures, and the danger that the jury might give causative weight thereto although there would be no medical evidence forthcoming to justify any connection. A second motion sought to preclude reference to plaintiff's mother's previous pregnancy difficulties because, again, there would be no medical tie-up. We go no further, however, than the first motion.

Defendants' response was, inter alia, that they had evidence to support the relevancy, viz., that expert testimony would be offered tying plaintiff's condition to inheritance to rebut the claim of obstetrical cau-

sation. Thus a leading article, *Antecedents of Cerebral Palsy*, "mentions that a motor deficit in a sibling predisposes another sibling to a higher risk of cerebral palsy." Danielle's medical record is "clearly relevant to the predisposition genetically to cerebral palsy."

Over plaintiff's protest, assertedly based upon extensive pretrial discovery to the effect that Danielle's seizures had been febrile (fever induced) and not relevant to plaintiff, the court permitted defendants to open to the jury with extensive references to alleged family genetic tie-ins. Starting with a reference to plaintiff's counsel as "my learned Brother from Boston," after having introduced himself as "Ron" and his partner as "Bill," (translation, if the reader needs assistance, "A city slicker from Massachusetts out to take two local boys,") and four times breaking an important rule of ethical conduct, that counsel should not express his personal belief,[1] counsel went the whole hog.

> We believe that there is evidence in the genetic data which links this family to a higher predisposition towards this disease....

> Mrs. Willey had a daughter born in 1979, two years before Angela was born. Her name was Danielle. She suffers from a seizure disorder since 1980.[2] You'll learn that a motor deficit, that's a seizure disorder, in a sibling is a risk factor of cerebral palsy.

> Mr. Willey has a brother who has been diagnosed and has for many years had Down's Syndrome, which is a mental retardation disease.

At the close of the evidence plaintiff moved to strike all reference to Danielle's seizures, and to Angela's uncle's Down's syndrome. It was so obvious that no evidence had linked Down's syndrome to cerebral palsy that defendants readily conceded that that should be stricken. Pausing here, we must wonder how could counsel, who had engaged in extensive discovery, and had prepared his case sufficiently to deliver a detailed nineteen page opening discussing the evidence, not know the favorable, and the limit of the favorable, evidence available to him? There was no suggestion that a witness had disappointed him; his only explanation was that it had not worked out.[3] Defendants refused, however, outright to withdraw their charge as to the relevance of Danielle's seizures, and the court agreed, albeit reluctantly. But what here, on review of the record, did the evidence show, in addition to the cryptic excerpt from the article *Antecedents*, not itself applicable unless tied in?

1. Questioning of Mrs. Willey, as to the details of Danielle's seizures.

2. Testimony that Danielle's seizures were febrile, and an opinion, post, of a reading "compatible with a seizure disorder."

3. Testimony by plaintiff's expert that Danielle's type of seizure did not indicate a predisposition to cerebral palsy in siblings. "Febrile seizures are a physiologic problem. It's not a problem that relates to organic brain damage."

4. No contrary testimony; not even a question addressed by defendants to their principal expert as to Danielle.

---

1. E.g., "I don't believe it [plaintiff's claim] to be the truth." That a lawyer "shall not assert his personal opinion" has long appeared in the *ABA Model Code of Professional Responsibility*, DR 7–106(C)(4) (1980), quoted, and cited with approval, in *United States v. Young*, 470 U.S. 1, 7, 105 S.Ct. 1038, 1042, 84 L.Ed.2d 1 (1985). *Accord American College of Trial Lawyers, Code of Trial Conduct*, 18(a)(4) (1987 Revision). Both should be known to counsel. While it is true that most judicial invocations of this principle relate to abuse by criminal prosecutors, the rule is not so limited in terms, and in *Young*, at 8, 105 S.Ct. at 1042–43, the Court observed that it applies "on both sides of the table."

2. The evidence was uncontradicted that Danielle had been symptom-free since 1983, a significant difference from plaintiff's irreversible malady.

3. "[A]lthough [Down's syndrome] was *interesting* early in the case, *at least potentially had reference to a motor deficit*, that [but?] we were not able to link it up." (Emphasis supplied). *Compare American College of Trial Lawyers Code, ante*, 18(a) TRIAL CONDUCT "[A] lawyer should not: (1) state or allude to any matter that he has no reasonable basis to believe ... will ... be supported by admissible evidence." Also *ABA Model Code, ante*, DR 7–106(C)(1). For, as has been said, though the song has ended, the melody may linger on.

On the basis of a full transcript on plaintiff's post-trial motion, the court stated, inter alia,

> Defendants [in opening] argued that ... genetic flaws in both parental lines predisposed Angela to CP.... Late in the trial, plaintiffs' attorney ... denied correctly that defendants' expert had equated Danielle's seizures with any type of motor deficit.... [D]uring the trial defendants' attorney engaged in a subtle shell-game on the phrases "seizure disorder" and "motor deficit," blurring the significance of these technical words for court and jury.... Defendants' experts never provided the nexus.

Pursuing this at oral argument, and picking up the "shell game" motif, we inquired, although not in these terms, where was the pea? Counsel answered,

> [T]he missing evidence was a connector; a connector between Danielle's seizures and a higher propensity ... for cerebral palsy.... *[W]e neglected to have a witness say that a seizure disorder in a sibling is equivalent to a motor deficit.* And when we looked at the transcript we thought we had it through one of the plaintiff's experts. (Emphasis supplied).

Pausing here, was it plaintiff's expert who counsel meant when he informed the court, "Yes, we have the evidence."? Plaintiff's expert had said no such thing on deposition. At trial he said,

> Q. [W]ere you provided with any records which indicated to you that a previous child had been diagnosed as having a seizure disorder in this case?
>
> A. My understanding is that that child had febrile seizures at the age of 14 months. That's not a seizure disorder. That's the result of a high fever.

The previously mentioned reference in *Antecedents* to motor deficits in siblings was read to the witness on cross-examination, and he agreed that it was read correctly, but he was not asked whether it affected his opinion, or, indeed, what it meant.

In chambers defendants' counsel had mentioned defendants' cerebral palsy expert, Dr. Chutorian, in assuring the court he had the evidence. If it was because of forgetfulness that counsel thereafter neglected to ask him about Danielle at all, he also forgot to inquire of defendants' other doctor. Continuing with counsel's response to us at oral argument,

> We didn't have it as clearly as it should have been. Perhaps we didn't have it at all. And when we looked at Dr. Nordgren's testimony, we didn't have it there. We realize *we neglected to ask him that.* I don't think that amounts to misconduct. (Emphasis supplied).

To this we asked the obvious question, "What does that have to do with the fairness of the trial?"

Dr. Nordgren is a neurologist, not defendants' cerebral palsy expert. He was asked by defendants to interpret an electroencephalogram that had been taken of Danielle. He testified that it was "compatible with a diagnosis of a seizure disorder." Passing the fact that "compatible" is not "probable," he further testified that "febrile seizures are seizures that are precipitated by a high fever and children—this is a very frequent problem, but most children with the disorder will outgrow it." Plaintiff's deficit is impossible to outgrow. Whatever the witness meant by compatible, and whatever defendants "neglected to ask him," what he in fact said was not far, if distant at all, from plaintiff's expert who testified, "Febrile seizures are a physiologic problem. It's not a problem that relates to organic brain damage."

The district court was manifestly unhappy. Referring to "the prejudicial atmosphere created by defendants' unwarranted use of genetic predisposition," it said,

> [T]he court acknowledges that defendants' irrelevant statements, which the court would not have admitted in evidence absent defendants' promise of expert testimony validating them, have at least to some extent, prejudiced plaintiffs' right to a fair hearing on admissible evidence.

> The question then becomes: Is that element of prejudice necessarily dispositive of plaintiffs' motion for a new trial?

The court answers that question in the negative for two reasons: first, defendants' counsel, in the course of a nine-day trial, relied steadily less on genetic predisposition so that by the time of his closing summary, it scarcely entered the equation.

It is true that counsel's closing reference was brief. At the same time, when an elephant has passed through the courtroom one does not need a forceful reminder. Unfamiliar, multisyllabic, medical terms may raise puzzling concepts, particularly when it is emphasized, as defendants were careful to do, that they are questionable, anyway. But what, a jury might say, is more obvious than that her sister had bad troubles—seizures? Seizures, we understand. Even her father's brother has very bad troubles—retardation, though not all the way. We understand that, too. That fine lawyer told us they were related. That makes sense. The judge told us to forget Down's syndrome, but how can we forget a thing like that? Aren't we the ones to decide the facts? We've been thinking about the uncle right from the start. And Danielle's seizures; those things run in the family. The judge didn't tell us to forget *them.* Lucky Danielle recovered.

Nor, in spite of the court's mention of defendants' downplaying, did the court withdraw its opinion that the matter was prejudicial. Rather, it gave a second reason.

Second, the case-in-chief presented by the defense was itself substantial enough that a jury could legitimately find that it tilted the scales of justice against the plaintiffs.... [B]oth sides produced sufficient testimony to warrant a jury verdict for either, and it is the "province peculiarly pertaining to the jury" to make that choice.... [T]he choices presented offered a classic conflict for resolution by a jury....

The court acknowledges the force of plaintiffs' complaint of prejudicial misrepresentation by defendants. Still, the court is sufficiently certain that the jury could have reached—not necessarily would have reached—the same verdict on the basis of admissible evidence that it is unwilling to find that plaintiffs have met the test set in *Borras* and reaffirmed in *Coffran,* ... and *Real.*

This was not the correct test. *Borras v. Sea–Land Service, Inc.,* 586 F.2d 881 (1st Cir.1978); *Coffran v. Hitchcock Clinic, Inc.,* 683 F.2d 5 (1st Cir.), *cert. denied,* 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982); and *Real v. Hogan,* 828 F.2d 58 (1st Cir.1987), were all cases in which the only ground asserted for seeking a new trial was, or came down to, a claim that the verdict was against the great weight of the evidence. If it was not against the great weight of the evidence, there was no error of any kind. That is a situation altogether different from where there was established error in the trial itself.

The court, unfortunately, was confused. In spite of finding that plaintiff had been prejudiced by defendants' improper conduct, it denied a new trial, relying on a case, *Garbincius v. Boston Edison Co.,* 621 F.2d 1171 (1st Cir.1980), where a new trial was denied because the error was harmless. In the case at bar plaintiff had failed to cite—indeed, still fails to cite—a case comparable to this one, where the error was not harmless, *Warner v. Rossignol,* 538 F.2d 910 (1st Cir.1976). There we found counsel's striking references, without evidentiary support, to a brain injury, required a new trial even though the court had instructed the jury to disregard them; indeed, required it so strongly that we reversed the court's denial. In the present case the court, rather than instruct as to the improper references, had refused plaintiff's request. A new trial is clearly called for.

This saga would be incomplete if we failed to note counsel's conduct in this court. In the course of oral argument a member of the court observed,

We're talking about various misconduct of counsel. I guess the standard is whether there should be a new trial.

Counsel replied,

Your honor, I'm a little troubled if the plaintiffs are now arguing that this court

ought to reverse the trial court because of misconduct of counsel. That is not a claim that is set forth anywhere in their original brief. It does appear in their Reply Brief as a final argument, but if that's the sole basis here, that isn't anything they ever raised or objected to at trial.

Defendants' counsel are at least consistent. Here the disregarded reality is that in plaintiff's original brief appears the following.

Perhaps the most compelling evidence of the prejudicial effect of the testimony relating to Danielle's seizures is provided by the conduct of the respective counsel in this case.... [D]efendants ... misrepresent[ed] to the trial judge that they would produce evidence to establish the relevance of this testimony.

In view of counsel's statements in chambers it can hardly be said that this was a last-minute thought. We need not recount the lapses as a result of which plaintiff did not receive a fair trial. Defendants have wasted nine trial days, and much else.

REVERSED. NEW TRIAL ORDERED.